NOTICE
Decision filed 07/21/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250161-U

NO. 5-25-0161

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 15-CF-510 |
| | ) | |
| DAVID B. BEVERLY, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Hackett and Clarke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in denying, following a third-stage evidentiary hearing, the defendant's amended successive postconviction petition. Because no argument to the contrary would have arguable merit, the defendant's appellate counsel is grantedleave to withdraw, and the judgment of the circuit court of Champaign County is affirmed.

¶ 2   The defendant, David B. Beverly, appeals the judgment of the circuit court of Champaign County that denied, following a third-stage evidentiary hearing, the defendant's amended successive postconviction petition. The Office of the State Appellate Defender (OSAD) was appointed as the defendant's appellate counsel. OSAD has concluded that this appeal lacks arguable merit and, on that basis, has filed a motion for leave to withdraw as counsel, pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), along with a supporting memorandum of law. OSAD properly served the defendant with notice. This court gave the defendant the opportunity to file a

1

response to OSAD's motion. The defendant has not filed a response. Having reviewed OSAD's *Finley* motion and memorandum, and the entire record on appeal, this court agrees with OSAD's assessment of this appeal. Therefore, we grant OSAD's motion, and we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4      The facts surrounding the defendant's conviction, following a jury trial, of the offense of first degree murder are described in detail in the defendant's direct appeal. See *People v. Beverly*, 2019 IL App (4th) 160168-U. Of significance to this appeal, at the defendant's trial, Dreshana Caston testified that she was the girlfriend of the victim, Arsenio Carter, and that she witnessed the murder. *Beverly*, 2019 IL App (4th) 160168-U, ¶¶ 4-5. She testified that she, Carter, and Caston's brother attended a barbecue at Oakwood Trace Apartments in Champaign on April 10, 2015, arriving there at approximately 4 p.m. or 5 p.m. *Beverly*, 2019 IL App (4th) 160168-U, ¶¶ 4-5. After remaining in their parked vehicle for approximately 10 minutes, they left for 5 or 10 minutes, then returned. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 6.

¶ 5      Upon their return, Caston saw the defendant and two other men. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 8. She testified that she could see the defendant's face, and that she "recognized his tattoos as well as his dreadlocks." *Beverly*, 2019 IL App (4th) 160168-U, ¶ 8. Caston testified that when she initially saw the defendant, he was wearing a black hoodie with the hood on, but that the hood was not tightly drawn and the defendant's dreadlocks were outside of it. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 8. When Caston was asked how sure she was of her identification of the defendant "at that time," Caston testified that she was " 'pretty sure.' " *Beverly*, 2019 IL App (4th) 160168-U, ¶ 9. She testified that she knew the defendant, that she had seen him on approximately five prior occasions when the defendant was " 'out' " and " 'going into clubs and

2

stuff like that,' " and that the defendant had been to her house for a social event. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 9.

¶ 6    Caston testified that at the barbecue, the defendant walked up to her vehicle. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12. She was asked how sure she was of her identification of the defendant as he approached her vehicle. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12. She testified, " 'It was David.' " *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12. She thereafter stated that she was referring to the defendant. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12.

¶ 7    Caston testified that she could see the defendant's tattoos, his face, and his hair. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12. She testified that it was light outside, and that she could see " 'a blue glove on [the defendant's] hand' " as the defendant approached her vehicle. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12. She asked, " '[W]hy would [the defendant] just be walking around with a blue glove on his hand unless he's going to do something to somebody[?]' " *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12. Caston was shown a picture of a blue glove, in the State's Exhibit No. 7, and "identified the glove in the picture as the same glove she saw [the] defendant wearing at the time of the shooting." *Beverly*, 2019 IL App (4th) 160168-U, ¶ 12.

¶ 8    Caston testified that as she tried to back her vehicle out of the parking lot, the defendant pulled out a short black gun. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 13. As Caston attempted to drive away, the defendant fired the gun at Carter, from a distance of about three feet away from the vehicle, shooting him in the chest. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 13. Caston testified that when she thereafter talked to the police, she pulled up a social media profile for the defendant on her cell phone. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 15. She testified that she knew the defendant by the nickname "Glocc," and that the social media profile listed its owner as "Glocc Murdablock Krazi." *Beverly*, 2019 IL App (4th) 160168-U, ¶ 15.

3

¶ 9    On cross-examination, Caston testified that when first questioned by police officers, she stated that the defendant was wearing light-colored jeans. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 17. When she later spoke with police officers, she was shown a mug shot of the defendant, and stated that he was the shooter. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 17. On redirect examination, Caston testified that the defendant pulled the glove from his pocket, and then held the gun with the glove when he shot Carter. *Beverly*, 2019 IL App (4th) 160168-U, ¶ 18.

¶ 10    After this court affirmed the defendant's conviction, but vacated his sentence and remanded for resentencing due to an error in the defendant's original sentencing (*Beverly*, 2019 IL App (4th) 160168-U, ¶ 126), the defendant filed, on April 1, 2021, a postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). The trial court denied the petition following a third-stage evidentiary hearing, and this court affirmed. See *People v. Beverly*, 2022 IL App (4th) 210677-U.

¶ 11    The defendant then sought leave to file two successive postconviction petitions, but subsequently withdrew each petition. The first successive postconviction petition, which the defendant sought leave to file on January 7, 2022, asserted a claim of actual innocence on the basis of an affidavit from Kamari Ray-Davis, which the defendant claimed provided an account of the shooting that contradicted Caston's testimony that the defendant was the shooter. However, on January 26, 2024, counsel, who was appointed to represent the defendant on the first successive postconviction petition, filed a motion to withdraw the petition. Therein, counsel stated that counsel and an investigator from counsel's office "completed additional investigation," and that after "[c]onsidering the new information obtained from that investigation," and consulting with the defendant, the defendant decided that he no longer desired to move forward with the petition.

4

¶ 12    The second successive postconviction petition, which the defendant sought leave to file on January 19, 2023, asserted a claim of actual innocence on the basis of an affidavit from Beth Emmons, which the defendant claimed provided an account of the shooting that contradicted Caston's testimony that the defendant was the shooter. However, on May 25, 2023, counsel who was appointed to represent the defendant on the second successive postconviction petition filed a motion to withdraw the petition. Therein, counsel stated that counsel and an investigator from counsel's office "completed additional investigation," and that "[i]n light of the new information obtained from that investigation," and after a consultation with the defendant, the defendant decided that he no longer desired to move forward with the petition.

¶ 13    On August 6, 2024, the defendant filed the amended successive postconviction petition (petition) that is the subject of this appeal. In the petition, the defendant raised a claim of actual innocence, in which he alleged that he was "legally and factually innocent of the charge of" first degree murder that he had been convicted of in 2016, and for which he was presently incarcerated. The defendant asserted that his actual innocence claim was based on the accompanying affidavit of Tavell Bates.

¶ 14    The defendant alleged that Bates's affidavit provided "newly discovered evidence" that could not have been discovered earlier because Bates "was not from the area" where the murder occurred, "and did not return to the area after the incident occurred." He further alleged that "Bates was not interviewed by police and did not make his identification of another individual known to the [defendant] or [t]rial [c]ounsel before trial." The defendant claimed that Bates's affidavit was "relevant and probative of the [defendant's] innocence," because it provided "firsthand eyewitness testimony of the shooting," and because it stated that the defendant "was not involved in the

5

shooting at any point." Thus, the defendant contended, Bates's affidavit contradicted "the principal evidence resulting in [the defendant's] conviction," which was Caston's testimony.

¶ 15    The defendant also alleged that Bates's affidavit was "non-cumulative, as the trial record contains only one firsthand account of the shooter," and "Bates directly contradicts the State's eye-witness testimony involving the [defendant] and is supportive of his innocence." He alleged that Bates's affidavit was conclusive for purposes of an actual innocence claim, because "while contradicted by the testimony of one State witness," the affidavit was "not positively rebutted," as "no evidence was presented at trial that" contradicted Bates's averment "that he was present when the shooting occurred," and that no evidence was presented that Bates "could not have observed what he states he saw." The defendant asserted that "[t]he State failed to present any other eyewitness testimony at the trial aside from Dreshanna [*sic*] Caston," who, "when asked how sure she was of her identification of the [defendant] at that time[,] *** stated she was 'pretty sure.' "

¶ 16    The defendant argued that "[t]he State's trial evidence was circumstantial and had only one first-hand account identifying the [defendant] as the malefactor," and that the State did not present "any physical or scientific evidence that would positively rebut Bates's statement that [the defendant] was not the shooter." He further argued that "the physical evidence that was presented was not linked to [the defendant] despite extraordinary attempts by law enforcement, specifically the use of a Michigan lab in an attempt to find [the defendant's] latent prints on the one recovered shell casing." The defendant asserted that "[t]he State presented no evidence at trial of a firearm connected by any forensic evidence to" him, and that there was not "any forensic evidence demonstrating that [the defendant] had discharged a firearm, despite his arrest mere hours after the shooting and, per the State's theory, wearing the same pants as he was during the commission of the offense and being in possession of a rubber glove the shooter was identified as having donned."

6

¶ 17    On September 20, 2024, the State filed a motion to dismiss the petition. On October 9, 2024, the trial court denied the State's motion and ordered the State to file an answer to the petition. On October 22, 2024, the State filed its answer. The trial court subsequently set the matter on January 6, 2025, for a third-stage evidentiary hearing, which was continued until February 20, 2025, due to inclement weather.

¶ 18    At the February 20, 2025, hearing, Bates testified that he was presently incarcerated in the Illinois Department of Corrections (IDOC), but that at the time of the shooting, in April of 2015, he lived in the Springfield area. He testified that he had never lived in the Champaign area, but that on the date of the shooting, he traveled to Champaign with two women whose full names he did not know. He testified that he and the two women went to the barbecue, along with two of his friends. When asked to name his two friends, Bates testified that he did not "want to involve their names." He testified that they arrived at the apartment complex "[a]fter 12" p.m., and that the barbecue was already going on. He testified that there were approximately 50 people at the barbecue, and that he did not know anyone other than the people he arrived with.

¶ 19    Bates testified that he did not know the defendant, or anyone who went by the nickname "Glocc," and did not see the defendant at the barbecue. He testified that "[m]aybe an hour or so" after he arrived at the barbecue, he observed a black woman and a black man arguing in the parking lot. Bates testified that the man was "[v]ery tall," but Bates could not otherwise describe him, other than to testify that he did not believe the man had any tattoos. He testified that the man and the woman got into a truck. He testified that this man was not the shooter, and described the shooter as having an afro, wearing a dark shirt, and having no tattoos. He testified that the first time he saw the shooter, the shooter was wearing a "sweat hoodie," but that the hoodie was not on the

7

man's head; he testified that at the time of the shooting, the hoodie was on the man's head. He testified that the shooter "didn't have any facial hair."

¶ 20　Bates testified that the very tall man was the person who ended up being shot. He testified that prior to the shooting, the shooter left the apartment complex, but then returned to where the very tall man and the woman were sitting in a truck, and fired a single shot into the passenger side of the truck, where the very tall man was sitting. Bates testified that he was "really close" to the truck when the shooting occurred, although he could not give an approximate distance, testifying that he was "not precise with the distance." He agreed that he observed the shooter for a total of approximately four minutes.

¶ 21　Bates testified that at some point after the shooting, the women he attended the barbecue with showed him a picture of the defendant, who had been arrested for the shooting. He testified that he told the women that the defendant was not the shooter. He testified that he observed the shooting, and that it was "[a]bsolutely" his testimony that the defendant was not the shooter. When asked why he did not contact the police, Bates testified, "I don't know, scared maybe. Didn't want to get involved." He testified that he was still in Champaign when he learned of the defendant's arrest, and that he had never before called the police to report a violent crime. When asked if he thought other people would talk to the police about the shooting, Bates testified, "I didn't think about that." He testified that he never returned to Champaign, that he could identify the shooter if he saw him, and that the shooter was not the defendant.

¶ 22　Bates testified that he first met the defendant in 2023 at Menard Correctional Center. He testified that the two men were "just talking," and the defendant told Bates that the defendant was at a barbecue in Champaign. Bates told the defendant that Bates was also at the barbecue. Bates testified that the defendant, not Bates, first brought up the barbecue while speaking to someone

8

else, and that Bates "jumped in the conversation." Bates testified that the defendant did not provide Bates with any information about the shooting, and that after he told the defendant that he witnessed the shooting, the defendant asked Bates to write an affidavit of what he remembered. Bates testified that he was not pressured by the defendant. The defendant did not coerce Bates, ask him to lie, or promise him anything. Bates testified that no one else promised him anything, that he was receiving no benefit for his testimony, and that he was testifying of his own free will. When asked why he was testifying, Bates testified that it was because he was "incarcerated for the same thing," that there are "a lot of other people that's incarcerated wrongfully," and that the defendant was "incarcerated wrongfully." He testified that no one, including the defendant, helped him write his affidavit.

¶ 23    On cross-examination, Bates agreed that when he arrived at Menard Correctional Center in 2023, it was his first time in an adult correctional institution, and that he had convictions for first degree murder and residential burglary. He further agreed that after he wrote his affidavit in this case, his relationship with the defendant "improved," and the two men "became kind of friendly." Bates agreed that after he filed his affidavit, he was interviewed by Champaign police officers. Bates again refused to name the two friends that he and the two females attended the barbecue with, and agreed that he had refused to name them to the police officers who interviewed him. He testified that the reason he refused to name the two friends was because he did not want the police to contact them. He testified that he also refused to provide the police with additional information about the two females, including phone numbers, information about their car, and their place of residence. He agreed that "out of the four people that [he had] specifically identified who could perhaps give some corroboration to [his] version of events," he refused to provide additional information about any of them. Bates further agreed that his two male friends were with him the

9

whole time at the barbecue, would have seen approximately the same things he saw, and that he still refused to identify them because he did not want the police to contact them.

¶ 24    Bates testified that he did not remember telling police officers that there were no basketball courts at the park near the apartment complex, and after being shown an aerial photograph of the park, agreed that if he had walked where he said he had walked, he would have passed basketball courts. He testified that he did not remember telling police officers that the shooter had a moustache, and presently did not remember the shooter having any facial hair. He thereafter testified that the shooter had a moustache, then stated, "I guess he had a moustache. He had something on his face, but he did not have a lot of hair on his face. He had barely—he didn't have any hair on his face, but here (indicating) by his nose he had a thin hair."

¶ 25    Bates testified that his present testimony was consistent with his description of the events to police, even though he told police that the shooter and the woman were arguing prior to the shooting, and that it was the very tall man who intervened to stop their argument. He testified that when the shooter returned prior to the shooting, the shooter "walked right past" Bates, which caused Bates to focus on him again. He testified that he could not recall whether he told police officers that he did not see the shooter's gun. He testified that when the shooter walked past him, the shooter did not have a gun pulled out, and that the shooter pulled out his gun when he reached the truck. Bates testified that he could not describe the gun. He agreed that his first statement to police came approximately nine years after the shooting, but testified that he still believed he could identify the shooter if he saw him.

¶ 26    On redirect examination, Bates testified that he did not receive protection in prison from the defendant in exchange for writing his affidavit. He testified that he did not go to the apartment complex to play basketball, and that he could have overlooked any basketball courts he saw on the

10

way. He testified that the argument he witnessed involved two people at first, the shooter and the female, and that the very tall man intervened and directed the female to the truck. With regard to the shooting, Bates testified that he saw the shooter's arm extend forward toward the passenger side window of the truck, but that he did not see a gun before that. Following Bates's testimony, the defense rested.

¶ 27    The State's first witness was Officer Stephen Vogel, who testified that he was a detective with the Champaign Police Department. He testified that on October 14, 2024, he met with Bates at Menard Correctional Center. He testified that Bates initially told him that Bates and his two male friends drove up to Champaign to meet the two females. Officer Vogel testified that Bates would not reveal the names of his two male friends, and that Bates stated that he did not remember where they stayed in Champaign, or any details about the vehicles he traveled in. He testified that Bates told him that Bates had been at the barbecue for about one and a half to two hours prior to the shooting. Officer Vogel testified that the shooting happened at approximately 6 p.m. He testified that Bates "affirmatively denied" that there were basketball courts at the park near the apartment complex, and that Bates told him the shooter had a moustache. On cross-examination, Officer Vogel agreed that Bates had not recanted his affidavit in this case.

¶ 28    Sergeant Robert DeLong of the Champaign Police Department testified that he had been involved in law enforcement for approximately 20 years, and that he was one of the original responders to the shooting in this case. He testified that he subsequently became involved in a "postconviction investigation with a Ms. Beth Emmons." He identified Emmons's affidavit, which was admitted into evidence. He testified that when he interviewed Emmons's sister in an effort to find Emmons, she told him that Emmons "was a drug addict, and liar." Sergeant DeLong testified that he believed those were "her exact words." He testified that when he located and interviewed

11

Emmons, her version of what happened on the date of the shooting differed from her affidavit. He testified that she told him that she did not witness the shooting, whereas in her affidavit she stated that she did.

¶ 29    Sergeant DeLong testified that Emmons claimed that she did not know the defendant, or anyone in his family. He testified that he conducted an investigation to determine if that was true, and found out that Emmons's nephew was incarcerated with the defendant at the same facility at the time Emmons's affidavit was filed, and that during part of that time, Emmons's nephew and the defendant "were housed in the same unit, on the same deck, and in the same block with cells directly across from one another." He added, "They would have shared common yard time and common area space."

¶ 30    Sergeant DeLong also testified that he was familiar with Kamari Ray-Davis. He testified that he interviewed Ray-Davis at the time of the shooting, and that Ray-Davis told him that Ray-Davis "had not seen anything." He testified that Ray-Davis stated that he heard a gunshot, but that Ray-Davis "had nothing else of value to offer" about the shooting. On cross-examination, Sergeant DeLong testified that Emmons "recanted her statement and stated she was no longer gonna be involved in any more court proceedings."

¶ 31    Following Sergeant DeLong's testimony, the parties presented argument, and the trial court took the matter under advisement. On February 25, 2025, the trial court entered the written order that is the subject of this appeal. Therein, the trial court noted that in the petition, the defendant claimed he was actually innocent because Bates allegedly witnessed the shooting and said the defendant was not the shooter. The trial court stated that the defendant's account contradicted the testimony of Caston, "the State's main witness at trial," because Caston testified that she knew the defendant, and that he was the shooter. The trial court added that "[a]lthough there was no gun

12

found and there was no DNA or fingerprints linking [the d]efendant to the shooting, Caston identified [the d]efendant as wearing blue latex gloves during the shooting and [the d]efendant had such gloves on his person at his arrest." The trial court continued that "[o]n direct appeal, the Appellate Court found that the evidence was not closely balanced and commented on Caston's testimony, the evidence of the blue latex glove and [the d]efendant's weak alibi evidence."

¶ 32   The trial court then thoroughly discussed the evidence presented at trial, as well as Bates's testimony at the hearing. The court stated that the testimony surrounding the affidavits filed by Davis and Emmons supported "the argument that [the d]efendant may have found people in [IDOC] who could assist him in filing affidavits which were later recanted." The trial court continued that "[e]ven before addressing what Bates said about the murder," the court had "concerns about his motive and interest in the case." The court noted that Bates "testified that he got involved *** because it was the right thing to do," and because Bates "did not want an innocent man in prison for something he did not do." The trial court stated that nevertheless, Bates "had several opportunities to do more than he has and he chose not to do so." The trial court pointed out that Bates claimed to know that police arrested the defendant within a day or two of the murder, but that Bates waited approximately eight years to come forward with his affidavit in support of the defendant. Bates also would not provide the names of the two male friends who were with him, which led the court to conclude that it was "not credible to believe that Bates want[ed] to help [the d]efendant but did not take steps to do so."

¶ 33   The trial court also found that it was "not credible the way in which Bates says he found out about the murder." The trial court further found that "it was not credible that Bates would put the important details of the offense in his affidavit when he claimed he never spoke to [the d]efendant about the facts." The trial court added that it could not "disregard that Bates is serving

13

a sentence for murder when considering his credibility" as a witness for the defendant. The trial court then recounted several internal inconsistencies in Bates's testimony, as well as inconsistencies between Bates's testimony and the testimony of other witnesses at the defendant's trial. The trial court noted, for example, that Bates testified that he arrived at the barbecue in the early afternoon, after 12 p.m., and that it was only an hour or so later when the argument and shooting occurred, whereas "[a]ll other witnesses said the argument and shooting occurred about 6 p.m." Likewise, whereas Bates "only identified two men at the car, the victim and the shooter," Caston testified that others, including the defendant, were there. The trial court stated that the foregoing suggested to the court that Bates was "not credible."

¶ 34    The trial court stated that to determine if the outcome of the defendant's trial probably would have been different with Bates's testimony, the court had to consider all of the evidence presented at the trial. The trial court pointed out that "Bates did not know [the d]efendant at all and only saw the perpetrator briefly," whereas "Caston knew [the d]efendant and recognized him—he had dreadlocks, tattoos and was wearing blue latex gloves which were found on" the defendant. The trial court stated that "Caston had no time to fabricate and no motive to lie," which suggested that she was "telling the truth." The trial court reiterated that at trial, the defendant presented a weak alibi, and that the defendant's trial "witnesses were vague on when they were with [the d]efendant and they contradict[ed] each other in terms of where they were with him and when."

¶ 35    The trial court stated that following a third-stage evidentiary hearing, the defendant had "the burden of proof by a preponderance of the evidence to show that his Constitutional rights were violated." The court continued that the defendant "must 'clearly and convincingly demonstrate that a [new] trial would probably result in acquittal.' " The court added, "Said another way, he must show that the new evidence is 'so conclusive that it is more likely than not that no

14

reasonable juror would find [the defendant] guilty beyond a reasonable doubt.' " The court ruled that Bates's testimony was newly discovered, material, and not cumulative, but that after considering Bates's credibility, and weighing the evidence presented at the defendant's trial, the court concluded that the defendant had "failed to establish the foregoing propositions." Accordingly, the trial court denied the petition. This timely appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    As noted above, OSAD has filed a *Finley* motion to withdraw as counsel. In the legal memorandum that accompanies its motion, OSAD states that it considered raising two issues: (1) whether the trial court applied the correct burden of proof when it denied the petition following the third-stage evidentiary hearing, and (2) whether the denial of the petition's actual innocence claim was manifestly erroneous. However, OSAD states that it concluded neither issue would have arguable merit. For the following reasons, we agree.

¶ 38    The Act provides a means by which a criminal defendant may assert that, in the proceedings that resulted in the defendant's conviction, there occurred a substantial denial of the defendant's rights under the United States Constitution, the Illinois Constitution, or both. *People v. Evans*, 2013 IL 113471, ¶ 10 (citing 725 ILCS 5/122-1(a)(1) (West 2022)). The Act allows the filing of only one postconviction petition without leave of court, and expressly states that any claims not raised in the original petition or an amended petition are waived. *Evans*, 2013 IL 113471, ¶ 10. However, a trial court may grant a defendant leave to file a successive postconviction petition in order to avert a fundamental miscarriage of justice. *People v. Harris*, 2024 IL 129753, ¶ 43. In such circumstances, the defendant must show actual innocence. *Harris*, 2024 IL 129753, ¶ 43.

¶ 39    When a defendant submits evidence in an attempt to demonstrate actual innocence, that "evidence must be new, material, noncumulative, and, most importantly, of such conclusive

15

character as would probably change the verdict on retrial." *Harris*, 2024 IL 129753, ¶ 47. For purposes of an actual-innocence analysis, "conclusive" means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Harris*, 2024 IL 129753, ¶ 65. "The conclusive-character element requires only that the [defendant] present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt," and therefore "[p]robability, not certainty, is the key, as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Harris*, 2024 IL 129753, ¶ 65.

¶ 40    At a third-stage evidentiary hearing, the trial court serves as the fact finder, and therefore must determine witness credibility, decide the weight to be given to particular testimony and evidence, and resolve any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34. At the hearing, the defendant bears the burden of showing the denial of the defendant's constitutional rights by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. A trial court's denial of a postconviction petition after a third-stage evidentiary hearing is reviewed for manifest error. *Coleman*, 2013 IL 113307, ¶ 98. Manifest error is error that is clearly evident, plain, and indisputable. *Coleman*, 2013 IL 113307, ¶ 98. "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98.

¶ 41    In this case, the trial court found that Bates's testimony was new, material, and not cumulative, but that because Bates was not credible, his testimony was not of such conclusive character as would probably change the verdict on retrial. Accordingly, the trial court denied the petition. We agree with OSAD that there is no arguable merit to the first potential issue OSAD considered raising: whether the trial court applied the correct burden of proof when it denied the petition following the hearing.

16

¶ 42 Whether a trial court applied the proper legal standard is a question of law that this court reviews *de novo*. *People v. Robinson*, 2021 IL App (1st) 171371, ¶ 52. As OSAD points out, even though the trial court erroneously stated in its order that the defendant "must 'clearly and convincingly demonstrate that a [new] trial would probably result in acquittal,' " the trial court preceded this statement by correctly stating that the defendant had "the burden of proof by a preponderance of the evidence to show that his Constitutional rights were violated." Likewise, earlier in the trial court's order, the trial court expressly stated that at a third-stage evidentiary hearing, "[a] defendant has the burden of proof by a preponderance of the evidence." Thus, both times the burden of proof was stated by the trial court in its order, it was stated correctly. Because the trial court twice correctly stated the defendant's burden of proof, and because there is nothing to indicate the trial court applied a different burden of proof, this court presumes the trial court correctly applied the preponderance of the evidence burden of proof. See, *e.g.*, *People v. Kluxdal*, 225 Ill. App. 3d 217, 223 (1991) (trial court is presumed to know the law and apply it properly, a presumption that is rebutted only when the record affirmatively shows the contrary). As OSAD also points out, the trial court denied the petition because the court found that Bates was not credible. The trial court never stated that it found Bates's testimony to be less than clear and convincing. Instead, it rejected Bates's testimony entirely, explaining in detail why it did so. In addition, the trial court stated that to determine if the outcome of the defendant's trial *probably* would have been different with Bates's testimony, the court had to consider all of the evidence presented at the trial, which suggests the trial court was holding the defendant to a preponderance of the evidence burden of proof, not a clear and convincing evidence burden of proof.

¶ 43 We also agree with OSAD that there is no arguable merit to the potential claim that the trial court's denial of the petition's actual innocence claim was manifestly erroneous. The actual

17

innocence claim was based entirely upon the testimony of Bates. The trial court, acting as the finder of fact, found that Bates was not credible. The trial court's reasons for that finding are laid out in detail above, and include skepticism of Bates's professed motive for coming forward with his affidavit, credibility issues with regard to how Bates claims to have learned of the circumstances surrounding the defendant's conviction, internal inconsistencies in Bates's testimony, and conflicts between Bates's testimony and that of other trial witnesses, including Caston. As OSAD aptly notes, the trial court's decision "was based upon the court's credibility assessment and the strength of the trial evidence." We conclude that the opposite conclusion to the one reached by the trial court is not clearly evident, and, accordingly, that the trial court's decision was not manifestly erroneous. See, *e.g.*, *Coleman*, 2013 IL 113307, ¶ 98.

¶ 44                                    III. CONCLUSION

¶ 45    For the foregoing reasons, we agree with OSAD that the two potential issues it considered raising in this appeal are without arguable merit. Moreover, this court's examination of the entire record establishes that this appeal presents no other issues of arguable merit. Therefore, the motion of appointed counsel to withdraw is granted, and the judgment of the circuit court of Champaign County is affirmed.


¶ 46    Motion granted; judgment affirmed.